UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

MATTHEW R. VIANES,                    )
                                      )
              Plaintiff,              )
                                      )
v.                                    )          Case No. 15-CV-0308-CVE-PJC
                                      )
TULSA EDUCARE, INC.,                  )
                                      )
                                      )
              Defendant.              )

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. # 31). Defendant asks the Court to grant summary judgment in its favor, arguing that plaintiff's reverse gender discrimination, age discrimination, retaliation, and intentional infliction of emotional distress claims fail as a matter of law. Id. Plaintiff responds that he does not intend to further pursue his age discrimination and retaliation claims, but asserts that there are genuine disputes of material fact regarding his reverse gender discrimination and intentional infliction of emotional distress claims, precluding summary judgment. Dkt. # 43. Defendant has filed a reply, and asks that the Court dismiss with prejudice the claims plaintiff no longer wishes to pursue. Dkt. # 46.

## I.

Plaintiff is a former employee of defendant, Tulsa Educare, Inc., a non-profit corporation designed to assist at-risk children with school readiness. Dkt. # 31, at 5; Dkt. # 43, at 6. Defendant partners with various Tulsa Public Schools and other community partners to help narrow achievement gaps for at-risk children by providing family and individual support and resources. Dkt. # 31, at 5; Dkt. # 43, at 6. Plaintiff applied and interviewed for a position as a "family advocate" with defendant in May 2012. Dkt. # 31, at 5; Dkt. # 43, at 6; Dkt. # 43-13. Elizabeth

Miranda, the Assistant Site Director, and Becky Mason, a Master Teacher, interviewed plaintiff. Dkt. # 31, at 4-5; Dkt. # 43, at 6.  Both Miranda and Mason recommended plaintiff for employment. Dkt. # 31, at 7; Dkt. # 47 at 7.  Plaintiff asserts that Miranda did not want to hire him, and that Mason had to convince Miranda that plaintiff was a good fit and would be a good hire for defendant. Dkt. # 43, at 12-13.  Plaintiff bases this assertion on Mason's affidavit in which she recounted a conversation with Miranda during which Miranda stated that she "[did not] feel that it's a really good idea to hire men sometimes because they, the parents and the moms, tend not to want to talk about what they've been through with men."  Dkt. # 43-2 at 1.  Nevertheless, both Miranda and Mason gave plaintiff a high rating as an ideal candidate for hire.  Dkt. # 31-9, at 4; Dkt. # 31-10, at 4.

Prior to his employment with defendant, plaintiff was employed by the Oklahoma Department of Human Services (DHS).  Dkt. # 31, at 6; Dkt. # 43, at 6.  Plaintiff resigned from his position after receiving a written reprimand within a probationary period for unsatisfactory performance, misconduct, and willful disobedience.  Dkt. # 31, at 6; Dkt. # 43 at 6.  Plaintiff's reprimand was related, in part, to delinquent reviews, delay in processing cases, and failure to return phone calls.  Dkt. # 31-4.  Plaintiff's resume included his employment with DHS, but did not mention his resignation after disciplinary action.  Dkt. # 31-8, at 2.  Plaintiff's resume stated that he managed a case load of 500 cases per month, "consistently performing with a 100% accuracy and timeliness."  Id.  Plaintiff asserts that his deficient performance and resignation from DHS was due to the increase in volume of people needing assistance and the state's refusal to hire more employees.  Dkt. # 43, at 3.

2

Defendant hired plaintiff to serve as a family advocate at Educare-Kendall Whittier, a role in which plaintiff served from May 23, 2012 until December 20, 2013. Dkt. # 31, at 7; Dkt. # 43, at 7. Mason served as plaintiff's direct supervisor when plaintiff first began his employment with defendant. Dkt. # 31, at 7-8; Dkt. # 43, at 7. Plaintiff worked under the supervision of Mason for only three to four months. Dkt. # 43-3, at 9. Plaintiff then briefly worked under the supervision of Monica Carrizalez before working under the supervision of Miranda as his direct supervisor. Dkt. # 43-1, at 40-41. Plaintiff's job duties included comprehensive parent education, family engagement activities, advocacy, case management, referrals for early intervention needs, and social service requests. Dkt. # 31-14. Plaintiff explained his position as encompassing a wide range of duties "from the time a prospective parent and child would walk in the building until the time they left," all designed to assist children in preparation for school and to assist the families. Dkt. # 31, at 7-9; Dkt. # 35, at 7.

Plaintiff was responsible for documenting each child's records both on a computer program known as Child Plus and in paper files. Dkt. # 31, at 8; Dkt. # 43, at 7. Each paper file contained a sign-sheet which a family advocate such as plaintiff was required to sign for each date he accessed the file. Dkt. # 31, at 8; Dkt. # 43, at 8. Each paper file was also to contain a Family Engagement Interest Survey form and a Family Partnership Agreement Service Plan that plaintiff was responsible for completing. Dkt. # 31, at 8; Dkt. # 43, at 7-8. Plaintiff was also responsible for maintaining many of these records in the Child Plus program. Dkt. # 31, at 8; Dkt. # 43, at 7. Plaintiff attended at least two mass training events for the Child Plus program, and admits that he attended meetings

conducted by Miranda, who provided training for family advocates, as often as once a week.[1]  Dkt. # 31, at 8-9; Dkt. # 43, at 8.  Mason provided plaintiff with written forms and instructions, which included instructions and procedures for family partnership service plans, guidelines for practice, family contact tracking sheets, instructions on completing service plans, and family re-assessment procedures.  Dkt. # 31, at 9; Dkt. # 43, at 9.  Mason also provided plaintiff with a document containing employee performance goals, which detailed specific enrollment and participation goals. Dkt. # 31, at 9; Dkt. # 43, at 9.

Miranda provided plaintiff with one-on-one training for the Child Plus computer program in September 2012.  Dkt. # 31, at 10; Dkt. # 43, at 9.  After a training session, plaintiff emailed Miranda thanking her for the training session and stating "I really feel better about these child plus entries.  In just a short time frame you gave me a great deal of information."  Dkt. # 31-19.  Plaintiff also requested additional training, to which Miranda promptly agreed.  Id.  Miranda reminded plaintiff of the importance of documenting activity in the Child Plus program, advising him that "if it is not documented in Child Plus, it didn't happen."  Dkt. # 31, at 10;  Dkt. # 43, at 9.  Beginning in November 2012 and periodically thereafter, Miranda notified plaintiff of necessary corrections in files for students for which plaintiff was responsible.  Dkt. # 31, at 10; Dkt. # 43, at 9.  Also in November 2012, plaintiff received a review regarding documentation and communication with

---

[1]     Plaintiff disputes the adequacy of training sessions and training materials provided to him by defendant.  Plaintiff argues that training sessions were inadequate and that he was given a 217-page "avalanche of paperwork" that was insufficient to train him, but admits that the documents were easy to understand.  Dkt. # 31, at 9; Dkt. # 43, at 9.  While plaintiff generally disputes the adequacy of his training, he provides no evidentiary support, other than his own, self-serving deposition.  And, in his deposition, plaintiff stated that the training was inadequate, without providing factual support for his conclusion.  Thus, the facts plaintiff disputes without evidentiary support are deemed admitted.

families, which included alerting plaintiff to incomplete family partnership agreements and parent interviews.  Dkt. # 31, at 10; Dkt. # 43, at 9.

On June 18, 2013, as part of plaintiff's annual performance review, defendant gave plaintiff a "needs development" rating in areas related to "ensuring family engagement and participation" and "job knowledge."  Dkt. # 31, at 11; Dkt. # 43, at 10.  On October 1, 2013, Miranda documented in a monthly report that plaintiff failed to keep families involved and failed to document any involvement that occurred.  Dkt. # 31, at 11; Dkt. # 43, at 10.  Miranda informed plaintiff by email of this finding in the monthly report.  Dkt. # 31, at 11; Dkt. # 43, at10.  On October 7, 2013, Miranda provided plaintiff with coaching regarding a specific child's file, detailing the specific actions plaintiff needed to take to complete the file.  Dkt. # 31, at 12; Dkt. # 43, at 11.  On October 14, 2013, Miranda documented in a monthly report that plaintiff failed to correctly complete documentation for each child's file.  Dkt. # 31, at 12; Dkt. # 43, at 11.  On October 17, 2013, Miranda emailed plaintiff with a plan to get all files up to date by October 24, 2013.  Dkt. # 31, at 12; Dkt. # 43, at 11.  On October 30, 2013, Miranda again emailed plaintiff, reminded him of the plan to get all files up to date, and gave him a new deadline of November 1, 2013.  Dkt. # 31, at 12-13; Dkt. # 43, at 11.  On November 1, 2013, Miranda communicated with plaintiff about his failure to properly record child absences.  Dkt. # 31, at 13; Dkt. # 43, at 11.  On November 4, 2013, Miranda again met with plaintiff and reviewed corrections that plaintiff needed to make to files.  Dkt. # 31, at 13; Dkt. # 43, at 11.  On November 5, 2013, Miranda gave plaintiff a memorandum detailing his performance failures, including failure to meet deadlines to get student files up to date, and giving plaintiff a new deadline of November 8, 2013 for corrections.  Dkt. # 31, at 13; Dkt. # 43, at 11.

On November 14, 2013, defendant issued plaintiff an Employee Counseling/Disciplinary Action Report regarding his failure to meet family participation goals and other job performance deficiencies.  Dkt. # 31, at 13; Dkt. # 43, at 12.  The disciplinary action report set certain performance goals and deadlines for plaintiff and stated that failure to meet the goals or deadlines would result in further discipline, which could include termination.[2]  Dkt. # 31, at 13; Dkt. # 43, at 12.  On November 27, 2013, Miranda issued plaintiff a second written warning, which again highlighted performance requirements that plaintiff failed to meet and again set specific performance goals and deadlines.  Dkt. # 31, at 14; Dkt. # 43, at 12.  On December 4, 2013, defendant issued a performance improvement plan (PIP) based on plaintiff's failure to meet performance requirements and associated goals.  Dkt. # 31, at 14; Dkt. # 43, at 12.  The PIP also imposed a December 20, 2013 deadline for plaintiff to meet certain goals contained in the PIP.  Dkt. # 31, at 14; Dkt. # 43, at 12.

---

[2]    Plaintiff disputes the accuracy of this and other disciplinary actions, asserting that he had received a previous satisfactory performance review from another supervisor, Carrizalez, and that Miranda disciplined him for issues preceding his hiring or before plaintiff was trained, and subjected him to harsher scrutiny than female employees.  Again, defendant relies largely on his own, self-serving deposition in which he states conclusions without factual support.  And the April 2013 performance review that plaintiff identifies reveals that defendant was rated as "needs development" in two areas that became critical issues relating to his December 2013 termination: family participation and job knowledge.  See Dkt. # 43-15.  To the extent that plaintiff relies on Mason's affidavit stating that plaintiff was a good employee who "was so perfect for this job" and "always did everything he was supposed to do when he was working," Mason left defendant's employment in August 2013 after a six-month leave and admits that she supervised plaintiff for only three to four months at the beginning of his employment before moving to another role that did not involve family advocates.  Dkt. # 43-2; Dkt. # 43-3, at 2-3, 9.  Mason thus was not involved in plaintiff's performance issues during the relevant period.  Similarly, Mason provides no factual support for her statement that defendant would use a progression of disciplinary actions to terminate employees that management decided they no longer wanted working for the company.  See Dkt. # 43-2, at 2.  Mason simply makes conclusory statements lacking any factual support.  The record, apart from unsubstantiated conclusions, does not support plaintiff's assertion that the disciplinary reports were inaccurate.  Plaintiff has failed to raise a genuine dispute as to the disciplinary record.

On December 20, 2013, defendant conducted a review of files for which plaintiff was responsible and noted deficiencies in plaintiff's maintenance of these files.  Dkt. # 31, at 14; Dkt. # 43, at 12.  On the same day, defendant terminated plaintiff's employment.  Dkt. # 31, at 14; Dkt. # 43, at 133.  Defendant prepared a form in connection with plaintiff's termination, which stated that plaintiff "was placed on a Performance Improvement Plan (PIP) by Supervisor Elizabeth Miranda concerning completion of paperwork and appropriate follow up with parents.  Deadlines were set and not met.  Expectations were not completed."  Dkt. # 31-3, at 1.  The form also noted plaintiff's specific failures, including inadequately documenting community referrals and help with family resources, failing to conduct follow-ups in a timely manner, and failing to complete all forms and keep each child's paper file up to date.  Id.

Plaintiff thereafter filed this action in Tulsa County District Court, alleging reverse gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII); retaliation in violation of Title VII; age discrimination, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (ADEA); retaliation in violation of the ADEA; and intentional infliction of emotional distress.  Dkt. # 2-1.  With respect to his reverse gender discrimination claim, plaintiff asserts that he was the only male who worked at his location and that he did not receive the same level of one-on-one training as other female employees. Id. at 4-5.  Plaintiff asserts that Miranda provided better and more comprehensive training to female employees, and that he was subject to disciplinary action even though he timely completed all of his work, in spite of unrealistic deadlines.  Id. at 5.  With respect to his intentional infliction of emotional distress claim, plaintiff asserts that defendant's conduct was extreme and outrageous because it resulted in plaintiff's termination and caused plaintiff health problems and mental

anguish. <u>Id.</u> Defendant removed the action to this Court. Dkt. # 2. Defendant now moves for summary judgment, arguing that it is entitled to judgment as a matter of law on plaintiff's reverse gender discrimination, age discrimination, retaliation, and intentional infliction of emotional distress claims. Dkt. # 31. Plaintiff responds that he no longer wishes to pursue his age discrimination and retaliation claims, but argues that summary judgment is inappropriate as to his reverse gender discrimination and intentional infliction of emotional distress claims. Dkt. # 43. Defendant, in its reply, asks the Court to dismiss with prejudice plaintiff's age discrimination and retaliation claims. Dkt. # 46. Although defendant asks the Court to dismiss these claims with prejudice, the proper procedure is for the Court to grant summary judgment in defendant's favor on these claims, because plaintiff, by abandoning these claims after discovery and a motion for summary judgment, has conceded that defendant is entitled to summary judgment on plaintiffs age discrimination and retaliation claims.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Kendall v. Watkins</u>, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

8

designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id. at 327 (quoting FED. R. CIV. P. 1).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law." Id. at 251-52. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

### A.

Defendant asserts that it is entitled to summary judgment on plaintiff's reverse gender discrimination claim, arguing that plaintiff cannot establish a prima facie case of reverse gender discrimination and that, even if plaintiff can establish a prima facie case, he cannot show that defendant's non-discriminatory reason for terminating him was a pretext. Dkt. # 31. Specifically, defendant asserts that plaintiff is not a member of a protected class, that plaintiff cannot demonstrate that defendant discriminated against men, and that defendant had a legitimate business reason for terminating plaintiff--that plaintiff repeatedly failed to fulfill his job responsibilities. Id. at 18-20.

Plaintiff responds that the evidence demonstrates that defendant favored women, that his termination was based on his gender, and that defendant's proffered reason for terminating plaintiff was a pretext. Dkt. # 43, at 22.

"Title VII forbids actions taken on the basis of sex that 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'" Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam) (quoting 42 U.S.C. § 2000e-2(a)(1)). Plaintiff asserts that defendant discriminated against him because he is male. Dkt. # 2-1, at 5. As plaintiff presents no direct evidence of reverse gender discrimination, plaintiff's claims is subject to the McDonnell Douglas[3] burden-shifting framework.[4] See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

> Under the McDonnell Douglas framework, the plaintiff must carry the initial burden
> under the statute of establishing a prima facie case of . . . discrimination. Once the

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[4] Plaintiff asserts that he has presented direct evidence of reverse gender discrimination, identifying as direct evidence Miranda's statement expressing doubt about hiring men because mothers often related better to female family advocates. Id. at 23. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." Hall v. United States Dep't of Labor, Admin. Review Bd., 476 F.3d 847, 854 (10th Cir. 2007). If any inference is required to suggest unlawful discrimination, the statement cannot be treated as direct evidence of discrimination. Roberts v. Int'l Bus. Machines Corp., 733 F.3d 1306, 1308 (10th Cir. 2013). "A statement that can plausibly be interpreted two different ways-one discriminatory and the other benign-does not directly reflect illegal animus, and thus does not constitute direct evidence." Hall, 476 F.3d at 855. Under this standard, Miranda's statement does not qualify as direct evidence of discrimination. Miranda's statement may be characterized as a general observation based upon her experience in the field rather than a revelation of a discriminatory animus. And, regardless of Miranda's statement, she rated plaintiff highly, recommended plaintiff for hire, and defendant hired plaintiff. Plaintiff also asserts that evidence of disparate treatment between male and female employees qualifies as direct evidence. Dkt. # 43, at 24. As the existence of disparate treatment would require an inference or presumption of a discriminatory animus, it similarly is not direct evidence of reverse gender discrimination.

plaintiff has established a prima facie case, [t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action.  If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.

Id. at 1226 (alteration in original) (internal quotation marks and citations omitted).

A prima facie case of gender discrimination normally requires a plaintiff to show: "(1) that the victim belongs to a protected class; (2) the victim suffered and adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." EEOC v. PNVF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007).  But, "'[w]hen a plaintiff who is a member of a favored group, [such as males] alleges disparate treatment, the courts have adjusted the prima facie case to reflect this specific context by requiring a showing of 'background circumstances' [which] support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" Sanchez v. Phillip Morris, Inc., 992 F.2d 244, 248 (10th Cir. 1993) (alterations in original) (quoting Livingston v. Roadway Express, Inc., 802 F.2d 1250, 1252 (10th Cir. 1986)).  "A different standard is applied to reverse sex discrimination claims because there is no reason to presume discrimination against historically favored litigants in the event of adverse employment actions." Babbar v. Ebadi, 216 F.3d 1086, at *5 (10th Cir. 2000) (unpublished table opinion) (citing Livingston, 802 F.2d at 1253).  Thus, in a reverse discrimination case, "a plaintiff 'must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority.'" Held v. Ferrellgas, Inc., 505 F. App'x 687, 690 (10th Cir.

11

2012) (unpublished)[5] (quoting <u>Argo v. Blue Cross & Blue Shield of Kan.,Inc.</u>, 452 F.3d 1193, 1201 (10th Cir. 2006)).

Plaintiff fails to demonstrate that the circumstances support an inference that defendant discriminated against the majority.  Plaintiff alleges that he was the only male employee at his site and that he did not receive the same one-on-one training that female employees received.  He also alleges that Miranda's comment about the ability of female employees to better relate to parents and Miranda's treatment of plaintiff in comparison to Miranda's treatment of female employees demonstrates a discriminatory animus.  But these allegations do not support the inference that defendant discriminated against men.  This is particularly evident when considering the evidence to the contrary: plaintiff received personal training from Miranda; Miranda promptly agreed to additional training when plaintiff requested it; plaintiff received numerous notices that his work was not in compliance with required standards; plaintiff was given numerous opportunities to correct his work; and plaintiff's allegation that female employees received one-on-one training with Miranda is no more than speculation.  Although plaintiff disputes the adequacy of the training he received, he provides no evidentiary support for this assertion.  <u>See</u> <u>supra</u> n.1.  Nor does plaintiff provide any evidentiary support for his assertion that female employees received better and more comprehensive training.  This allegation is based solely on plaintiff's observation of female employees in Miranda's office at various different times.  However, plaintiff presents no evidence that he was aware of the nature or subject of these meetings, and he cannot show that these were indeed additional training sessions to which plaintiff was not afforded the same opportunity.  In fact, when asked about

---

[5]     This and all other unpublished decisions are not precedential but may be cited for their persuasive value.  <u>See</u> FED. R. APP. 32.1; 10TH CIR. R. 32.1.

Miranda's treatment of female employees, specifically about whether plaintiff had any evidence of preferential treatment "other than females meeting behind closed doors with Elizabeth Miranda going through files, documents, and the child files on the computer like you did with Ms. Miranda" and a single example of a female advocate's meeting with Miranda regarding a specific family, plaintiff answered "I don't have a response for you."  Dkt. # 31-6, at 34-35.  Plaintiff also admitted that Miranda never made any comments to him regarding his gender, nor did any other employee. Id. at 26.

And the Tenth Circuit has upheld a district court's grant of summary judgment in defendant's favor in numerous instances involving claims of reverse gender discrimination, demonstrating the difficulty of showing that an employer discriminates against the majority with respect to gender. See, e.g., Clark v. Cache Valley Elec. Co., 573 F. App'x 693, 697 (10th Cir. 2014) (finding no evidence of reverse gender discrimination when supervisor displayed preferential treatment to only one female employee); Held, 505 F. App'x at 691 (finding no inference of reverse gender discrimination when basis for claim was plaintiff's participation in a team where he was the only male and a female co-worker's rude behavior); Babbar, 216 F.3d 1086, at *6 (finding evidence of three less qualified female professors receiving tenure over male professor insufficient to establish prima facie case of reverse gender discrimination).  This caselaw underscores the burden that a plaintiff alleging reverse gender discrimination carries, and plaintiff has failed to satisfy his burden. Plaintiff has failed to provide sufficient evidentiary support to show that defendant discriminates against men.

Even if plaintiff were able to demonstrate that the circumstances would support an inference that defendant is one of the unusual employers that discriminates against the majority, plaintiff

cannot demonstrate that the challenged adverse employment action--plaintiff's termination--took place under circumstances giving rise to an inference of discrimination. Plaintiff had a long and documented history of failing to meet expectations, fulfill deadlines, and adequately perform his job duties. The record shows that defendant, on multiple occasions, notified plaintiff of his inadequate performance, attempted to work with him to correct such inadequacies, and gave plaintiff multiple deadlines to bring his work into conformity with defendant's expectations. Defendant engaged in an on-going effort to correct plaintiff's deficient performance before it decided to terminate his employment. Again, although defendant disputes the validity of his disciplinary actions, he provides no evidence for his assertions that the disciplinary actions were inaccurate. See supra n.2. And his prior work history with DHS, the true nature of which he concealed from defendant when he applied, underscores that plaintiff had long-standing issues with compliance with job responsibilities, including meeting deadlines and properly documenting his work. Based on the documented disciplinary record and the lack of evidence to the contrary, the Court concludes that plaintiff has failed to demonstrate that his termination occurred under circumstances giving rise to an inference of discrimination. Instead, the evidence demonstrates that plaintiff was terminated after a detailed and documented effort to help plaintiff fulfill his job duties and plaintiff's inability to conform with defendant's expectations of him. Because plaintiff can neither show background circumstances of discrimination against the majority, nor an inference of discrimination surrounding his termination, plaintiff fails to establish a prima facie case of reverse gender discrimination.

Finally, even if plaintiff were able to establish a prima facie case of reverse gender discrimination, plaintiff fails to provide any evidence demonstrating that defendant's proffered reason for terminating plaintiff--that it was based on a history of performance deficiencies--is a

14

pretext for a discriminatory motive.  "A showing of pretext does not require a plaintiff to offer any direct evidence of actual discrimination."  Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1113 (10th Cir. 2007).  Rather,  "[a]n employee may show pretext based on 'weakness, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." Id. (quoting Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1997)).  Defendant asserts that it terminated plaintiff's employment based on plaintiff's continued performance deficiencies.  Plaintiff provides no evidence that this non-discriminatory motive is pretextual.  Plaintiff asserts that his termination occurred because he is a male and because Miranda did not want a male working for defendant.  However, as stated previously, the record reveals a long and well-documented pattern of performance deficiencies.  And, plaintiff's employment with his previous employer, DHS, ended for largely similar reasons: plaintiff's inability to meet deadlines and accurately and sufficiently perform his tasks.  Based on the scope of the record of plaintiff's disciplinary actions, his inadequacies in his performance, and his inability to correct his failures, the Court concludes that plaintiff has failed to show that defendant's reason for terminating plaintiff was a pretext. Defendant's legitimate, non-discriminatory reason for terminating plaintiff contains no weakness, implausibility inconsistency, incoherency, or contradiction that would render defendant's proffered reason unworthy of belief.  As such, plaintiff has failed to demonstrate pretext.

In sum, plaintiff fails to establish a prima facie case of reverse gender discrimination because he fails to demonstrate that defendant is "one of the usual employers that discriminates against the majority" and he fails to show that his termination occurred under circumstances giving rise to discrimination.  And even if plaintiff could establish a prima facie showing of reverse gender

15

discrimination, he fails to satisfy his burden of demonstrating pretext.  Defendant should thus be granted summary judgment on plaintiff's Title VII reverse discrimination claim.

## B.

Defendant argues that it is entitled to summary judgment on plaintiff's remaining claim, a state law claim for intentional infliction of emotional distress.  Dkt. # 31, at 29.  Pursuant to 28 U.S.C. § 1367(a), a federal court may exercise supplemental jurisdiction over claims related to the claims over which it has original jurisdiction.  A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3); see Gaston v. Ploeger, 297 F. App'x 738, 746 (10th Cir. 2008) (stating that § 1367(c)(3) expressly permits a district court to decline to exercise supplemental jurisdiction over remaining state law claims after granting summary judgment in favor of defendant on federal law claims).  This Court does not have original jurisdiction over plaintiff's intentional infliction of emotional distress claim because that claim arises under state law.  And there is no evidence of diversity jurisdiction.  The decision to exercise supplemental jurisdiction is discretionary, but courts should consider "the nature and extent of pretrial proceedings, judicial economy, convenience, and [whether] fairness would be served by retaining jurisdiction."  Anglemeyer v. Hamilton Cnty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995) (quoting Thatcher Enters. v. Cache Cnty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990)).

The Court finds that the extent of the pretrial proceedings and judicial economy weigh in favor of exercising supplemental jurisdiction over plaintiff's state law intentional infliction of emotional distress claim.  Although the Tenth Circuit has "repeatedly recognized that [allowing Oklahoma courts to resolve issues of Oklahoma law] is the preferred practice," in this instance,

plaintiff's state law claim does not present a novel issue, and the nature and extent of the proceedings, judicial economy, convenience, and fairness, would all be served by exercising jurisdiction over this claim.   See Gaston, 297 F. App'x at 786.   The Court thus exercises supplemental jurisdiction over plaintiff's remaining state law claim.

Defendant argues that it is entitled to summary judgment on plaintiff's claim because plaintiff has presented no evidence to support a finding of outrageous and intentional conduct or severe emotional distress.   Dkt. # 31, at 29.   Plaintiff responds that summary judgment is inappropriate because defendant's conduct was extreme and outrageous when it caused plaintiff to lose his job and plaintiff suffered from high blood pressure and mental anguish as a result of defendant's actions.   Dkt. # 43, at 27.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.   See Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).   This action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46.   Id.   In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.   Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"   The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376 (quoting Restatement (Second) of Torts § 46 cmt. d.).   To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4)

17

the resulting emotional distress was severe.  Schovanec v. Archdiocese of Okla. City, 188 P.3d 158, 175 (Okla. 2008) (quoting Computer Pubs., Inc. v. Welston, 49 P.3d 732, 735 (Okla. 2002)).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may reasonably be regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards."  Trentadue v. United States, 397 F.3d 840, 856 n.7 (10th Cir. 2005) (applying Oklahoma law).

In cases arising out of the workplace, Oklahoma appellate courts have found that a defendant engaged in extreme and outrageous conduct only when that defendant intentionally and persistently engaged in a course of conduct that harmed the plaintiff.  See Computer Pubs., 49 P.3d at 736 (claim should have been submitted to a jury when plaintiff presented evidence that harassment lasted more than two years and caused plaintiff to quit her job, move, and repeatedly change phone numbers); Miner v. Mid-America Door Co., 68 P.3d 212 (Okla. Civ. App. 2002) (employer's alleged failure to reassign the plaintiff after learning of workplace harassment, even if unreasonable, was not extreme and outrageous); Gabler v. Holder & Smith, Inc., 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); Mirzaie v. Smith Cogeneration, Inc., 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, inter alia, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); Zahorsky v. Community Nat'l Bank of Alva, 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

18

Plaintiff simply fails to provide any evidence that would support a finding of intentional infliction of emotional distress. The standard for such a claim under Oklahoma law is demanding, and plaintiff has not alleged any actions that "may reasonably be regarded as sufficiently extreme and outrageous" to qualify as intentional infliction of emotional distress. Plaintiff complains of unfair treatment by his supervisor during his employment that resulted in his termination. This falls far short of conduct that goes "beyond all possible bounds of decency" and is "regarded as atrocious and utterly intolerable in a civilized community." At best, plaintiff complains that his supervisor intentionally discriminated against him because he is a male and that he was terminated as a result. This allegation does not rise to the level of outrageous and extreme conduct so as to sustain an intentional infliction of emotional distress claim. And defendant asserts he suffered from physical ailments and mental anguish, but does not provide sufficient evidence for the Court to conclude that he suffered severe emotional distress because of defendant's actions. In the absence of facts demonstrating intentional or reckless conduct that is "outrageous in character" and "extreme in degree" and severe emotion distress, defendant should be granted summary judgment on plaintiff's intentional infliction of emotional distress claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 31) is **granted** on all of plaintiff's claims**.** A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine (Dkt. # 28) is **moot**.

**DATED** this 8th day of July, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

19